**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CITY OF BOSTON, THE BOSTON PUBLIC HEALTH COMMISSION, THE BOSTON HOUSING AUTHORITY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:18-cv-12174-LTS |
| PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; INSYS THERAPEUTICS; CARDINAL HEALTH INC.; MALLINCKRODT LLC; MALLINCKRODT PLC; SPECGX LLC; MCKESSON CORPORATION; AMERISOURCEBERGEN DRUG CORPORATION; WALGREENS BOOTS ALLIANCE d/b/a WALGREEN CO d/b/a WALGREENS OF MASSACHUSETTS, LLC; DR. FATHALLAH MASHALI; NEW ENGLAND WELLNESS & PAIN MANAGEMENT, P.C. a/k/a NEW ENGLAND PAIN ASSOCIATES, P.C. OF MASSACHUSETTS AND RHODE ISLAND, a/k/a GREYSTONE PAIN MANAGEMENT, INC., a/k/a NEW ENGLAND PAIN INSTITUTE, P.C.; and JANE DOES 1 – 50, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPPOSITION TO MOTION TO REMAND
AND INCORPORATED MEMORANDUM OF LAW**

Defendants AmerisourceBergen Drug Corporation ("ABDC"), McKesson Corporation, and Cardinal Health, Inc. (collectively, "Distributor Defendants" or "Distributors") respectfully submit this Opposition to Plaintiffs' Motion to Remand and Memorandum of Law in Support of their Opposition, stating as follows.

## INTRODUCTION

ABDC removed this action because the City of Boston, the Boston Public Health Commission, and the Boston Housing Authority ("Plaintiffs") claim that the Distributor Defendants breached legal duties arising under the federal Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA"). After removal, the Judicial Panel on Multidistrict Litigation ("JPML") issued an order conditionally transferring this case to *In re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio) (the "MDL" or "MDL 2804") for consolidated pretrial proceedings.

This Court need not and should not reach the merits of Plaintiffs' remand motion. Instead, for the reasons set forth in the Distributors' Motion to Stay, filed herewith, this Court should defer consideration of Plaintiffs' remand motion and allow the issue presented in that motion to be decided on a national basis, alongside almost identical claims brought by other plaintiffs across the country as part of the national opioid litigation in MDL 2804.

Were this Court to reach the merits of Plaintiffs' remand motion, the Court should deny the motion. Federal question jurisdiction under 28 U.S.C. § 1331 is proper under the Supreme Court's four-part test set forth in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), and *Gunn v. Minton*, 568 U.S. 251 (2013). Under that test, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting

the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258; *see One & Ken Valley Hous. Grp. v. Me. State Hous. Auth.*, 716 F.3d 218, 224 (1st Cir. 2013); *R.I. Fishermen's All., Inc. v. R.I. Dep't of Envtl. Mgmt.*, 585 F.3d 42, 48 (1st Cir. 2009).

Here, all four factors are satisfied. *First*, Plaintiffs' Complaint necessarily raises federal issues because Plaintiffs base their claims against the Distributor Defendants on alleged failures to report and halt "suspicious orders" for prescription opioids—a duty that arises out of the federal CSA. *Second*, the parties actually dispute the federal issues because they contest whether the Distributor Defendants violated the CSA. *Third*, the federal issues are substantial given the federal interest in uniform enforcement of the CSA's nationwide regulatory scheme and the federal government's asserted interest in the subject matter of this litigation. *Fourth*, federal jurisdiction will not upset any federal-state balance.

Furthermore, even if it were necessary to obtain consent to removal by Defendant Dr. Fathallah Mashali and his allegedly related entity—New England Wellness & Pain Management, P.C. (notwithstanding an order dissolving this entity)—and its alleged aliases (collectively, the "Mashali Defendants"), Dr. Mashali has, in fact, already communicated to ABDC his consent to removal of this action.

For these reasons, the Court should deny Plaintiffs' remand motion.

## BACKGROUND

### I.    Plaintiffs' Action

Plaintiffs filed this lawsuit in Massachusetts Superior Court, County of Suffolk, on September 13, 2018. The Complaint asserts claims against three groups of Defendants: (1) manufacturers, which make and promote opioid medications; (2) Distributors, which are pharmaceutical wholesale distributors; and (3) a physician, Dr. Mashali, who allegedly

prescribed excessive opioid medications, and the entity or entities through which he allegedly operated.[1]

With respect to Distributor Defendants, Plaintiffs complain of over-distribution of prescription opioids into Massachusetts and allege that Distributor Defendants "failed to maintain effective controls over the distribution of prescription opioids, and who instead have actively sought to evade such controls[,] . . . and [failed] to take steps to hald suspicious orders when then were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market."  Compl. ¶ 9.  The Complaint asserts five counts against ABDC and the other Distributor Defendants: public nuisance (Count I); violations of the provisions of Mass. Gen. Laws ch. 93A (Count II); negligence and negligent misrepresentation (Count III); fraud and fraudulent misrepresentation (Count IV); and unjust enrichment (Count V). *See* Compl. ¶¶ 358-436, Prayer for Relief.

Plaintiffs' central theory against Distributor Defendants is that they allegedly violated duties "to detect, report, and refuse to ship suspicious orders of opioids in order to prevent diversion of these dangerous drugs for non-medical purposes." Compl. ¶ 43. Plaintiffs specifically allege, among other things, that the Distributor Defendants have violated the duties governing reporting and shipping of "suspicious" opioid orders arising from the federal Controlled Substances Act ("CSA") and its implementing regulations.  *See* Compl. ¶¶ 9, 192-211, 213, 217-41, 261, 263, 265-70, 281-87, 364, 385-86, 400-06, 415.

---

[1] In addition to the three groups of Defendants, the Complaint also purports to state claims against unknown Defendants described as "JANE DOES 1 – 50," who are not considered for purposes of removal.  *See, e.g.*, *Green v. America Online (AOL)*, 318 F.3d 465, 470 (3d Cir. 2003) (citation omitted); *see e.g.*, *Parks v. Town of Leicester*, Civ. No. 10–30120–FDS, 2012 WL 2088926, *3 (D. Mass. June 7, 2012) (action involving multiple defendants including unknown "John Doe," removed on original jurisdiction grounds).

Plaintiffs thus rely on federal law to establish the alleged duties to report and halt shipments of suspicious orders for controlled substances. *See, e.g.*, Compl. ¶ 192; *id.* ¶ 193 ("Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970 ["CSA"].  The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals. . . ."); *id.* ¶ 194 ("The CSA requires manufacturers and distributors of Schedule II substances like opioids to[,]" among other things, "maintain effective controls against diversion . . . and [] design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA."); *id.* ¶ 197 (quoting 21 C.F.R. § 1301.74(b)); *id.* ¶ 206 (quoting 21 C.F.R. §§ 1301.71(a), 1306.04(a)).  Although Plaintiffs purport to disavow stating a federal question, Massachusetts law does not impose an independent duty on wholesale distributors to report or halt shipments of suspicious orders for prescription opioids.

## II.      The Multidistrict Litigation

Plaintiffs' claims are the same as those being asserted in federal court by more than a thousand other municipalities and other plaintiffs.  To consolidate these cases for coordinated pre-trial proceedings, the JPML formed an MDL in the Northern District of Ohio.  In total, more than a thousand actions are now pending in the MDL, including more than 100 transferred from Massachusetts.  As new cases are filed across the country each week, the JPML continues—and will continue—to transfer more actions to the MDL.  On October 29, 2018, the JPML issued an order conditionally transferring this case to the MDL on the ground that it appears to "involve questions of fact that are common to the actions previously transferred to the Northern District of Ohio and assigned to Judge Polster."  Conditional Transfer Order (CTO-63), JPML Dkt. No.

2926.  The JPML will likely make a final decision regarding transfer shortly after November 29, 2018.[2]  The Distributor Defendants are, accordingly, filing a contemporaneous motion to stay this action while the JPML makes its determination.

To the extent that the Court reaches the merits of Plaintiffs' motion to remand, however, that motion should be denied for the reasons set forth in the Notice of Removal and below.

## ARGUMENT

### I.   The Court Should Not Rule on Plaintiffs' Remand Motion on an Emergency Basis, But, Rather, Should Stay this Action

The Court need not, and should not, reach the merits of Plaintiffs' remand motion or act on an emergency basis, but rather, should defer consideration of Plaintiffs' remand motion and allow the issue presented in that motion to be decided on a national basis, alongside almost identical claims brought by other plaintiffs across the country as part of the national opioid litigation in MDL 2804.  This action by City of Boston is one of hundreds of related lawsuits asserting claims against manufacturers, distributors, pharmacies, and physicians arising out of the sale, marketing, and distribution of prescription opioid medications.  Concurrently with the start of proceedings in this Court, the JPML will be deciding whether to transfer this action to a multidistrict litigation pending before Judge Dan Polster in the MDL, where the case would join more than a thousand other opioid-related actions involving common factual allegations, common legal issues, and common defendants.

For these reasons, set forth more fully in the accompanying Motion to Stay, the Court should defer consideration of Plaintiffs' remand motion until the JPML makes a final transfer

---

[2] *See* http://www.jpml.uscourts.gov/hearing-information.

decision.  Were the Court to consider Plaintiffs' remand motion, however, the motion should be denied.

## II.     Plaintiffs' Complaint Contains a Question of Federal Law

Remand would be inappropriate in this case because the Complaint presents questions of federal law.  Federal courts have removal jurisdiction over "any civil action brought in a State court of which the district courts of the United States have original jurisdiction," 28 U.S.C. § 1441(a), and original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331.  "A single claim over which federal-question jurisdiction exists is sufficient to allow removal." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005); *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).

Even where state law creates the causes of action asserted in a complaint, one or more of those causes of action may raise a federal question sufficient to warrant removal jurisdiction under the Supreme Court's *Grable* and *Gunn* decisions.  *See Gunn*, 568 U.S. at 258; *Grable*, 545 U.S. at 315.  Given Plaintiffs' reliance on duties arising under federal law, all four of the requirements for federal jurisdiction—a federal issue that is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance—are satisfied.[3]  Therefore, this Court has jurisdiction.

---

[3] Courts have found these factors to be satisfied in cases where state law claims are predicated on violations of federal statutes governing complex, nationwide regulatory schemes for which uniformity is essential. *See, e.g.*, *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, NA*, 824 F.3d 308, 315-18 (2d Cir. 2016) (state law claims based on alleged violation of Internal Revenue Code satisfy *Grable*); *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) (state law claims premised on violations of Exchange Act "necessarily raise disputed issues of federal law of significant interest to the federal system as a whole"); *Broder*, 418 F.3d at 196 (state law claims premised on alleged violations of Communication Act satisfy "*Grable (Continued)*

### A.      The Complaint "necessarily raises" a federal issue

Plaintiffs' state law claims "necessarily raise" a federal question because its "asserted right to relief under state law requires resolution of a federal question." *R.I. Fishermen's Alliance*, 585 F.3d at 49.  Significantly, "an action under 28 U.S.C. § 1331(a) arises . . . *if the action requires construction of a federal statute*, or at least a distinctive policy of a federal statute requires the application of federal legal principles." *V.I. Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 916 (3d Cir. 1994) (emphasis added); *see Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 808-09 (1986) (federal question jurisdiction exists if "vindication of a right under state law *necessarily turn*[*s*] *on some construction of federal law*" (emphasis added, internal citation omitted)).

In determining whether state law claims turn on construction or application of federal law, the Court must "begin by considering the duty underlying each claim." *NASDAQ*, 770 F.3d at 1020. "A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law," *Jacobson*, 824 F.3d at 315, or where the "singular duty" underlying the claim arises under federal law, *NASDAQ*, 770 F.3d at 1021. Here, Plaintiffs' claims necessarily raise federal issues because they are premised on Distributors' alleged violations of legal duties—*i.e.*, the duties to report and halt suspicious orders for controlled substances—that arise out of the CSA and its implementing regulations.  *See* 21 C.F.R. § 1301.74(b); *Masters Pharm*, 861 F.3d at 212-13.

Despite its protestations to the contrary, Plaintiffs' reliance on federal law is evident on

---

test for federal-question removal jurisdiction"); *Ranck v. Mt. Hood Cable Regulatory Comm'n*, No. 3:16-cv-02409-AA, 2017 WL 1752954, at *5 (D. Or. May 2, 2017).

the face of its Complaint. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (federal jurisdiction exists when federal question is presented "on the face of the plaintiffs' properly pleaded complaint"). Throughout the Complaint, Plaintiffs cite federal laws and regulations to establish the duties to report and halt suspicious orders, and repeatedly alleges that Distributors' violations of these duties give rise to Plaintiffs' causes of action. *See, e.g.*, Compl. ¶ 193 (requirements imposed on distributors by CSA to "adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion"); *id.* ¶ 197 ("To ensure that even drugs produced within [DEA-assigned] quota are not diverted, Federal regulations issued under the CSA mandate that all registrants, manufacturers and distributors alike, 'design and operate a system to disclose to the registrant suspicious orders of controlled substances.'") (quoting 21 C.F.R. § 1301.74(b)); *id.* ¶ 206 ("Under the CSA, pharmacy registrants are required to 'provide effective controls and procedures to guard against theft and diversion of controlled substances.'") (quoting 21 C.F.R. § 1301.71(a)); *id.* ¶ 217 (alleging, "the DEA pointed out the red flags wholesale distributors should look for to identify potential diversion"); *id.* ¶¶ 285-86 (alleging that statements made on Distributors' behalf in *Masters Pharm.* "acknowledged that they understood their obligations under the law . . . [and] that their conduct was in compliance with those obligations"); *id.* ¶ 400 ("Distributor Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids, which are Schedule II Controlled Substances [under the CSA], by failing to monitor for, failing to report, and filing highly suspicious orders time and again.").

As these and other citations demonstrate, Plaintiffs' claims against Distributor Defendants rest squarely on allegations that they breached duties arising out of the CSA and its implementing regulations. Plaintiffs assert that Massachusetts law incorporates federal

regulations promulgated under the CSA, *see* Compl. ¶ 192, but they fail to cite any specific provision of state law that imposes a requirement that wholesale pharmaceutical distributors or pharmacies identify and report suspicious orders of controlled substances to a Massachusetts government official or entity, or a state law source for a requirement that wholesale pharmaceutical distributors halt suspicious orders of controlled substances from registered pharmacies.

To the contrary, the Massachusetts laws that Plaintiffs cite—specifically, Mass. Gen. Laws Ann. ch. 94C §§ 7(a), 12(a)(1) and (2), *see* Compl. ¶¶ 192, 199, 206—pertain to the prerequisites for the issuance of a registration to manufacture or distribute controlled substances. None of these statutory provisions creates duties to report and halt shipments of suspicious orders.   Plaintiffs' claim of negligence and negligent misrepresentation illustrates this point, as Plaintiffs allege that "Distributor Defendants misrepresented their compliance with their duties under the law and concealed their noncompliance and shipments of suspicious orders of opioids to Boston and destinations from which they knew opioids were likely to be diverted into Boston . . . ."  Compl. ¶ 401 (Count III).  The alleged duty to prevent or halt shipments of suspicious orders arises *solely* under the federal CSA, and *not* under state law.  "Thus, it is not logically possible for the plaintiffs to prevail on this cause of action without affirmatively answering the embedded question of whether federal law" required Distributor Defendants to report and halt shipments of suspicious orders for prescription opioids under the circumstances. *Rhode Island Fishermen's All.*, 585 F.3d at 49. "That is enough to make out a federal question." *Id.*

Although a plaintiff "may avoid federal jurisdiction by *exclusive* reliance on state law," *Caterpillar*, 482 U.S. at 392 (emphasis added), Plaintiffs' claims here have no such exclusive state law basis.  As noted, Plaintiffs' assertion that Federal regulations under the CSA are

"incorporated into Massachusetts law pursuant to [] M.G.L.A. 94C § 12(a)(1) and (2)," Compl. ¶ 193, is, as a matter of law, incorrect.  Plaintiffs have identified no such statutory obligations of Distributors under state law to report, or stop, suspicious orders for controlled substances.

By contrast, most of the cases upon which Plaintiffs rely in urging this Court to remand this action are unavailing, *see* Pls. Mem. (Doc. 13) at 4-5, 9, 14, involve alleged violations of state laws that impose duties on distributors, such as requirements to report prescription drug diversions to state regulatory bodies. *See Uintah County, Utah v. Purdue Pharma, L.P.*, No. 2:18-cv-585-RJS, 2018 WL 3747847, at *1 (D. Utah Aug. 7, 2018) (alleging, among other things, violation of duty to report suspicious opioid orders to "the Utah Department of Health") (quoting complaint); *Weber County, Utah v. Purdue Pharma, L.P.*, No. 1:18-cv-00089-RJS, 2018 WL 3747846, at *1 (D. Utah Aug. 7, 2018) (same); *New Mexico v. Purdue Pharma L.P.*, 323 F. Supp. 3d 1242, 1251 (D.N.M. 2018)[4] (allegations by State Attorney General of violations of state regulations requiring distributors to report prescription drug diversions to the New Mexico Board of Pharmacy, as well as to adopt measures to prevent diversion); *Delaware ex rel. Denn v. Purdue Pharma L.P.*, No. 1:18-cv-383, 2018 WL 1942363, at *3 (D. Del. Apr. 25, 2018) (allegations by State Attorney General  of violations of Delaware Controlled Substances Act, which requires "distributors to maintain 'effective controls against diversion [into illegitimate] channels'") (quoting 16 Del. C. § 4735(b)(1)–(2)); Mem. Op. & Order, *West Virginia ex rel. Morrisey v. McKesson Corp.*, No. 2:17-cv-3555 (S.D. W. Va. Feb. 15, 2018) (alleging multiple violations of the West Virginia Uniform Controlled Substances Act).[5]

---

[4] The citation furnished by Plaintiffs is No. 1:18-cv-00386-JCH-KBM, 2018 WL 2943246 (D.N.M. June 12, 2018).

[5] The remand order in *Oklahoma ex rel. Mike Hunter v. Purdue Pharma, L.P.*, is likewise of no assistance to Plaintiffs here because the removing party in that action had stipulated that it would *(Continued)*

By contrast, Plaintiffs' claims here rely on alleged violations of duties arising solely from the federal CSA, and Plaintiffs cannot locate parallel state-law statutory requirements to support their allegations against Distributor Defendants.   Plaintiffs acknowledge that the Complaint "reference[s] CSA violations," yet also assert that the Complaint "makes clear that Massachusetts law and the Massachusetts Controlled Substances Act require [Distributors] . . . to, among other things, report and halt suspicious orders and maintain effective controls against diversion."  Pls. Mem. at 11.  But, again, Plaintiffs cite no applicable state law.   Plaintiffs may not repeatedly allege violations of federal law and then argue that they have not raised a federal question.

In short, Plaintiffs have not identified and cannot identify any state law duty that could support their claims that Distributors over-distributed controlled substances into Massachusetts. Plaintiffs' purported state law causes of action hinge on their allegations that Distributors breached duties arising out of the CSA and its implementing regulations. To determine whether Distributors breached those duties, a court would necessarily have to interpret and apply the CSA.  Plaintiffs' claims therefore necessarily raise federal issues.

### B.    The parties "actually dispute" the federal issue

The federal issues raised by the Complaint are "actually disputed" because the parties contest whether the CSA and its implementing regulations in fact give rise to duties to report and halt suspicious orders for prescription opioids, the scope and contours of any such duties under the CSA, and whether Distributors violated these alleged duties.   Because Plaintiffs' claims

---

not remove the action based on the original petition, and further, unlike Distributor Defendants here, did "not assert that resolution of a substantial question of federal law is necessary in relation to an essential element of plaintiff's state law claims."  Order, *Oklahoma ex rel. Mike Hunter v. Purdue Pharma, L.P.*, No. 18-cv-574-M (D. Okla. Aug. 3, 2018) at 9 n.4.

against Distributors depend on their theory that Distributors breached these alleged duties, this issue is the "central point of dispute." *Gunn*, 568 U.S. at 259.

In assessing whether Distributors breached duties arising out of the CSA, the Court must examine "the contours of [the] federal duty," "the scope of that duty," and "whether [Distributors' conduct] amounted to a breach of that duty." *NASDAQ*, 770 F.3d. at 1023. This inquiry will require the Court to determine, among other disputes, (1) whether the CSA and its implementing regulations in fact give rise to the duties to report and halt suspicious orders, (2) what any such duties entail, (3) what constitutes a "suspicious" delivery under the CSA's implementing regulations, (4) what actions should have been taken to resolve those suspicions or "halt" the shipment, and (5) whether existing processes satisfy federal reporting guidelines.

Given these disputes, Plaintiffs cannot credibly maintain that the federal issue is not "actually disputed." Distributors deny that they violated their duties under the CSA in the manner alleged in Plaintiffs' Complaint. Plaintiffs' allegations that Distributor Defendants were investigated and fined by DEA for an alleged "failure to maintain effective controls against diversion" is a red herring. Compl. ¶ 222. Even if prior settlements with other government entities related to *other jurisdictions* were relevant to this matter (they are not), those settlements would not establish that Distributors have conceded liability to Plaintiffs. Thus, the parties actually dispute whether Distributors violated the CSA by allegedly failing to report and stop suspicious orders.

## C. The federal issues are "substantial"

The substantiality inquiry looks "to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260, 261-62; *see R.I. Fishermen's All.*, 585 F.3d at 51; *Massachusetts v. Wampanoag Tribe of Gay Head*, 36 F.Supp.3d 229, 234 (D. Mass. 2014). A federal issue "can

be important for many reasons," including because (1) "state adjudication would undermine the development of a uniform body of federal law"; (2) "resolution of the issue has broad significance for the federal government"; or (3) "the case presents a nearly pure issue of law that would have applications to other federal cases." *Bd. of Commissioners of Se. La. Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) (alterations and quotation marks omitted). Exercising federal question jurisdiction in such cases "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312. That common-sense notion applies here.

### 1.   There is a federal interest in interpreting the CSA uniformly

The federal issues presented here are important because there is a "substantial federal interest" in ensuring "uniformity of interpretation" of the CSA. *R.I. Fishermen's All.*, 585 F.3d at 51. Courts have often found federal issues to be sufficiently substantial where they raise "questions [that] involve aspects of . . . complex federal regulatory scheme[s] . . . as to which there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Broder*, 418 F.3d at 195 (quotation marks omitted).

In *R.I. Fishermen's Alliance*, for example, the First Circuit found that there was a significant federal interest in ensuring that states comply with a federally-sanctioned interstate fishery management plan, and that such compacts are uniformly interpreted. 585 F.3d at 51. In *NASDAQ*, the Second Circuit similarly ruled that "the disputed federal issue in th[e] case—whether [the defendant] violated its Exchange Act obligation to provide a fair and orderly market in conducting an IPO—is sufficiently significant to the development of a uniform body of federal

securities regulation to satisfy the requirement of importance to the federal system as a whole."
770 F.3d at 1024 (quotation marks omitted).  Likewise, in *Jacobson*, the Second Circuit held that
"minimizing uncertainty over the tax treatment of mortgage-backed securities, as Congress
intended, fully justif[ied] resort to the experience, solicitude, and hope of uniformity that a
federal forum offers on federal issues." 824 F.3d at 318.

Similarly, Plaintiffs' claims implicate uniformity concerns because they would require
this Court to determine the existence and scope of Distributors' obligations under the CSA and
whether Distributors breached those duties. In enacting the CSA, Congress stated that it was
"providing the legitimate drug industry with a *unified* approach to narcotic and dangerous drug
control."  H.R. Rep. No. 91-1444 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4572 (emphasis
added). To this end, Congress declared that while the CSA does not occupy the field of
controlled substances regulation, state law on controlled substances cannot create a "positive
conflict" with the CSA.  21 U.S.C. § 903. Thus, the legislative history and the text of the CSA
state a substantial federal interest in consistent, nationwide regulation of controlled substances
distribution.   Plaintiffs' claims "involve aspects of the complex federal regulatory scheme
applicable to" the national prescription drug supply chain.  *Broder*, 418 F.3d at 195. They are
thus "sufficiently significant to the development of a uniform body of [controlled substances]
regulation to satisfy the requirement of importance to the federal system as a whole." *NASDAQ*,
770 F.3d at 1024.

Furthermore, "minimizing uncertainty over" reporting and shipping obligations under the
CSA "justifies resort to the experience, solicitude, and hope of uniformity that a federal forum
offers on federal issues." *Jacobson*, 824 F.3d at 317-18 (quotation marks and alteration omitted).
"Given that . . . plaintiff['s] claims turn on the interpretation of the federal regulations

governing" controlled substances and also given "the importance of those regulations to the Congressional scheme, this case plainly falls within the narrow swath of cases described in *Grable*." *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 174 n.5 (1st Cir. 2016).

It should thus be left to federal courts—here, a single MDL—to interpret the CSA.

### 2.   The federal issues presented in this case have broad significance

The scope of the obligations the CSA places on distributors of pharmaceuticals has broad significance to the federal government, including by affecting the DEA's ability to enforce the CSA. The federal government itself has already made clear the effect that the opioid litigation will have on its ability to enforce the CSA. Most notably, the Department of Justice has filed a Statement of Interest on behalf of the United States in the MDL proceedings, asserting the federal government's interests in, among other things, its "law enforcement and legal activities in conjunction . . . with the multidistrict litigation," specifically including "[c]riminal and civil tools available under the Controlled Substances Act." *In re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804 (N.D. Ohio Mar. 1, 2018), ECF No. 161, at 7.

Allowing a state court to resolve state law claims premised on violations of the CSA—and to determine the existence and scope of any duties under the CSA—creates the potential for inconsistent interpretations of the CSA across jurisdictions. *See* 21 U.S.C. § 903 (although Congress did not intend to "occupy the field" of controlled substances regulation with CSA, CSA pre-empts inconsistent state law). Conflicting interpretations of the CSA issued by state courts would inevitably undermine the federal government's efforts to enforce the statute and sow confusion among federally regulated entities.

### 3.   This case presents a nearly pure issue of law that would have applications to other federal cases

As noted, this case would require a court to determine the existence of duties arising

under the CSA, the scope and contour of any such duties that exist, and "whether [Distributors'

conduct] amounted to a breach of that duty." *NASDAQ*, 770 F.3d. at 1023.  These questions

present "nearly pure issue[s] of law" that would necessarily have applications to other federal

cases.  *One & Ken Valley Hous. Grp.*, 716 F.3d at 225.  Indeed, these issues apply to the more

than one thousand actions pending in the MDL.  Moreover, the resolution of this legal issue will

apply broadly to all cases in which a plaintiff alleges that any distributor of pharmaceuticals

breached its alleged duties to report or halt shipments of suspicious orders.

>    **D.   Federal jurisdiction will not disrupt the Congressionally-approved balance of federal-state judicial responsibilities.**

Finally, the federal issues presented by Plaintiffs' Complaint are capable of resolution in

federal court "without disrupting the federal-state balance approved by Congress."  *Gunn*, 568

U.S. at 258.  Federal courts exclusively hear challenges to DEA authority to enforce the federal

CSA against distributors.[6]  Similarly, federal courts have exclusive jurisdiction over proceedings

seeking to enjoin violations of the CSA.  *See* 21 U.S.C. § 882(a).  Thus, federal courts already

are the exclusive forum for determining the permissible scope of restraints on Distributors under

the federal CSA.  Furthermore, as explained above, allowing cases like this one to proceed in

federal court promotes uniform development of federal law.  By contrast, litigating this case in

state court runs the risk of the state court applying federal requirements inconsistently with the

manner in which DEA—the federal agency responsible for enforcing the CSA—applies them.

This case does not implicate any comparably important state law issues.  This Court

---

[6] *See, e.g.*, *PDK Labs. Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786 (D.C. Cir. 2004) (challenge to DEA program enforcing CSA to prevent diversion of ephedrine); *Admin. Subpoena Walgreen Co. v. U.S. Drug Enf't Admin.*, 913 F.Supp.2d 243 (E.D. Va. 2012) (resolving motion to require DEA to return subpoenaed documents); *Cardinal Health, Inc. v. Holder*, 846 F.Supp.2d 203 (D.D.C. 2012) (challenge under Administrative Procedure Act to DEA order suspending registration of distribution facility).

would be required to apply well-settled state tort law only *after* it resolves the federal question regarding the Distributors' obligations under the CSA.  This Court will not be usurping any state judicial responsibilities in this case.

> E.     **A federal cause of action is not essential to jurisdiction**

Plaintiffs incorrectly argue that the lack of a federal cause of action renders federal jurisdiction lacking.  Pls. Mem. at 17.  That argument is inconsistent with *Grable*.  In *Grable*, the Supreme Court specifically held that lack of a federal cause of action does *not* foreclose federal-question jurisdiction.  *See Broder*, 418 F.3d at 196; *In re Pharm. Indus. Average Wholesale Price Litig.*, 457 F.Supp.2d 77, 80 (D. Mass. 2006) ("It is now clear under *Grable* that the lack of a private federal cause of action does not preclude jurisdiction.").  Thus, the fact that the CSA does not afford Plaintiffs a private right of action does not diminish the federal questions here.

## III.    THE MASHALI DEFENDANTS HAVE CONSENTED TO REMOVAL

Plaintiffs cannot defeat removal based on the absence of the Mashali Defendants' consent at the time the Notice of Removal was filed.  Assuming, *arguendo*, that the Mashali Defendants' consent to removal was required, the absence of unanimity is not a jurisdictional defect in the removal process, but a procedural one that may be cured.  *See Esposito v. Home Depot U.S.A., Inc.*, 590 F.3d 72, 77 (1st Cir. 2009) ("technical defect in the removal process" resulting from failure to obtain consent of a co-defendant was cured either by that non-consenting defendant's filing of an answer or opposition to the plaintiff's remand motion, "clearly communicating its desire to be in federal court").  In its Notice of Removal, ABDC outlined the steps it had taken to determine whether process had been served upon the Mashali Defendants prior to the filing of

the Notice of Removal—a process that was complicated by Dr. Mashali's incarceration.[7]

Thereafter, ABDC learned that Plaintiffs had apparently served Dr. Mashali in prison.

Accordingly, counsel for ABDC spoke with Dr. Mashali by telephone.  During that telephone

call, Dr. Mashali verbally consented to removal of this action and stated that he would indicate

his consent to removal in writing.  *See* Declaration of Kyle M. Noonan, dated Nov. 13, 2018, ¶¶

2-4.  Thus, any procedural defect in the removal process has been cured.   As of the time of this

filing, ABDC has not received Dr. Mashali's written consent to removal and will supplement this

Opposition by filing a copy of the written consent upon its receipt.

As noted, however, the Mashali Defendants are nominal parties whose consent to

removal is not required because Plaintiffs seek relief almost exclusively from Distributor

Defendants and Manufacturer Defendants based on their alleged conduct.  *See Tri-Cities

Newspapers, Inc. v. Tri-Cities Printing Pressmen & Assistants' Local 349,* 427 F.2d 325,

327 (5th Cir. 1970) ("The ultimate test of whether the . . . defendants are . . .

indispensable parties . . . is whether in the absence of the (defendant), the Court can

enter a final judgment consistent with equity and good conscience which would not be

in any way unfair or inequitable to plaintiff." (quotation marks omitted)); *Broyles v.

Bayless,* 878 F.2d 1400, 1403 (11th Cir. 1989) ("[A] real party in interest is a party

that has a real and substantial stake in the litigation and who exercises substantial

control over the litigation.").  The judgment-proof Mashali Defendants have no real and

---

[7] It is unclear whether the Complaint purports to name an entity other than New England
Wellness & Pain Management, P.C., as a defendant, because it only names various alleged
aliases of this entity.  In any event, according to the online records of the Secretary of the
Commonwealth of Massachusetts, New England Wellness & Pain Management, P.C. has been
dissolved by court order or an order of the Secretary of the Commonwealth, as has New England
Pain Associates, P.C., which was formerly known as New England Pain Institute, P.C.

substantial stake in the litigation and, thus, are not real parties in interest from whom consent to removal was required.

For the foregoing reasons, and those set forth in the Notice of Removal, were the Court to reach the merits of Plaintiffs' remand motion, the motion should be denied.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court defer consideration of Plaintiffs' remand motion until the JPML makes a final transfer decision or, in the alternative, deny Plaintiffs' motion for remand.

WHEREFORE, Defendants respectfully request that this Honorable Court:

A.  Defer consideration of Plaintiffs' Motion to Remand (Doc. 12) until the JPML makes a final transfer decision or, *in the alternative*,

B.  Deny Plaintiffs' Motion to Remand in its entirety; and

C.  Grant such other and further relief as justice may require.

Respectfully submitted,


Dated:  November 13, 2018              */s/ Joshua D. Dunlap*
                                       Joshua D. Dunlap (BBO # 672312)
                                       PIERCE ATWOOD LLP
                                       254 Commercial Street
                                       Portland, ME 04101
                                       Tel.: (207) 791-1100
                                       Fax: (207) 791-1350
                                       jdunlap@pierceatwood.com

                                       *Counsel for AmerisourceBergen Drug*
                                       *Corporation*

*/s/ Alison M. Newman*
Alison M. Newman (BBO # 693953)
WILLIAMS & CONNOLLY, LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel.:  (202) 434-5354
anewman@wc.com

*Counsel for Cardinal Health, Inc.*


*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart (BBO #547499)
COVINGTON & BURLING LLP
OneCity Center
850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: (202) 662-6000
ghobart@cov.com

*Counsel for McKesson Corporation*


## Certificate of Service

I hereby certify that on November 13, 2018, I electronically filed the foregoing document

with the Clerk of Court using the CM/ECF system, which will send notification of this filing to

all counsel of record.

*/s/ Joshua D. Dunlap*
Joshua D. Dunlap (BBO # 672312)